UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

ALICIA MOORE,

                     Plaintiff,                                  **COMPLAINT**

      -against-


DITMAS PARK TWO LLC,
CARNEGIE MANAGEMENT INC., & ISAAC JACOBS,

                     Defendants
------------------------------------------------------------------x

## PRELIMINARY STATEMENT

      1.     This is an action brought by Alicia Moore, a low income tenant residing at 2211

Ditmas Avenue, Brooklyn, New York, a residential complex owned by defendant Ditmas Park

Two LLC.  Ms. Moore receives an "enhanced" Section 8 voucher subsidy that entitles its holder

to continued occupancy in the apartment for which the voucher was issued.

      2.     Plaintiff, a tenant and holder of a Section 8 housing subsidy voucher, faces

eviction from her home in retaliation for her refusal to waive her rights under federal, state, and

local law.   Her landlord, defendant Ditmas Park Two LLC, is threatening to commence

summary eviction proceedings against her in New York City Civil Court on the sole allegation

that she has refused to agree to lease terms that would waive her rights under 42 U.S.C. §

1437f(t) to remain in her apartment and would require her to pay rent above what is permitted by

the Section 8 statute and rules. Defendants have also demanded that plaintiff waive a number of

rights guaranteed her under state and local law, including protection from discrimination based

on source of income

      3.     Defendants are subject to 42 U.S.C. § 1437f(t) because their  predecessor-in-

ownership of plaintiff's apartment received a HUD-subsidized mortgage.  Defendants' eviction threat is the latest in a series of attempts since they purchased the building to evade their obligations under the law.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

5.      This Court has authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § 22201 et seq.

6.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because plaintiff and all defendants are located in this district.

## PARTIES

### I.      PLAINTIFF

7.      Plaintiff Alicia Moore has been the tenant of 2211 Ditmas Avenue, Apartment 4E (the "subject premises") since approximately 2003.  Since November 2005, she has been a holder of an "enhanced" Section 8 voucher pursuant to 14 U.S.C. §1437f(t) administered by the New York City Housing Authority.

8.      Ms. Moore lives with her 17 year-old daughter.  The family receives long-term disability benefits and public assistance benefits.

### II.      DEFENDANTS

9.      Defendant Ditmas Park Two, LLC (hereinafter "Ditmas")is a domestic corporation, established and existing in the State of New York, having its principal place of business at 545 Broadway, 4th Floor, Brooklyn, New York.  Ditmas is the owner of 2211 Ditmas Avenue (a/k/a 2201 Ditmas Avenue a/k/a 2203 Ditmas Avenue), a large residential building located in Brooklyn in which plaintiff Alicia Moore is a tenant.  The building at 2211 Ditmas

Avenue was subsidized by the United States Department of Housing and Urban Development (hereinafter "HUD") with project-based rental subsidies until 2005, when defendant's predecessor-in-interest opted out of its contract.

10.     Upon information and belief, Carnegie Management Inc. is a domestic corporation established and existing in the State of New York, having its principal place of business at 545 Broadway, 4th Floor, Brooklyn, New York.  Upon information and belief, Carnegie Management Inc. is registered with the New York City Department of Housing Preservation and Development as the managing agent for 2211 Ditmas Avenue, Brooklyn.

11.     Upon information and belief, Defendant Isaac Jacobs is the head officer of Ditmas Park Two LLC, and also the chairman and chief executive officer of Carnegie Management Inc., and has his principal place of business in all capacities at 545 Broadway, 4th Floor, Brooklyn, New York.

## STATUTORY AND REGULATORY SCHEME

**I.     SECTION 8 STATUTE AND RULES**

The Housing Act of 1937, 42 U.S.C. § 1437 et seq., authorized a program to establish local housing authorities to develop, own, and operate low-rent public housing projects with the assistance of federal loans.  The program provides rent subsidies to lower income families to enable them to obtain safe and decent housing.  This program is commonly known as "project-based" Section 8

Project-based Section 8 differs from tenant-based Section 8, in that project-based subsidies are tied to a particular residential building or apartment, and are used to lower the rent paid by tenants living in that apartment.  A tenant who moves from that premises loses the benefit of the subsidy.  Tenant-based Section 8 subsidies are provided to individual tenants, who

can carry them along when they move to a new apartment.

Typically, a private building enters into the project-based Section 8 program as a condition of a contract by which the owner receives a low-interest mortgage that is subsidized by HUD.  In return for favorable mortgage terms, such contracts require that the building be kept affordable to low- and moderate-income tenants by use of Section 8 subsidies.  Such contracts usually have 20-year terms, at the end of which the building owner may opt to pay off the HUD-subsidized mortgage and remove the building from the terms and conditions of the Section 8 . Apartments in an opted-out building can be rented at market rate.

In order to prevent sudden, large-scale displacement of tenants who reside in project-based Section 8 buildings, Congress amended the Housing Act in 1999 to provide that, upon removal of a building from the program, current tenants receive "enhanced" Section 8 vouchers. See 42 U.S.C. § 1437f(t).  Enhanced vouchers provide subsidies that pay the difference between the reasonable market price of the rental and the greater of 30 percent of the tenants' household income or the rental amount that the household was paying when the tenants first became eligible for enhanced vouchers. See 42 U.S.C. § 1437f(t)(1)(D).  In other words, enhanced vouchers allow tenants to continue to pay an affordable rent even after the owner begins to charge a market rate.

42 U.S.C. §1437f(t) further prohibits an owner from evicting an enhanced voucher-holding tenant without cause.  In pertinent part, the text of 42 U.S.C. § 1437f(t)(1)(b) provides that

> [e]nhanced voucher assistance under this subsection for a family shall
> be voucher assistance under subsection (o), of this section, except that under such
> enhanced voucher assistance -
> (B) the assisted family may elect to remain in the same project in which
> the family was residing on the date of the eligibility event for the project...

4

"Eligibility event" is defined in 42 U.S.C. § 1437f(t)(2) as follows:

> For purposes of this subsection, the term "eligibility event" means, with respect to a multifamily housing project, ...the termination or expiration of the contract for rental assistance under this section for such housing project...results in tenants in such housing project being eligible for enhanced voucher assistance under this subsection.

If the tenant moves from the apartment, then the enhanced voucher converts to a regular Section 8 voucher that the tenant takes to their new home, but with a lower payment standard. See 42 U.S.C. § 143f(t)(1)(C).  No further subsidy applies to any future tenant who moves into the vacated market-rate apartment.

HUD has made it clear that formerly HUD subsidized landlords must comply with  42 U.S.C. § 1437f(t)(1)(b) by accepting tenants' enhanced vouchers and allow them to remain in their apartments unless evicted for cause.  HUD's Section 8 Renewal Policy Guidebook, issued by the Office of Multifamily Housing on January 15, 2008, provides guidance about an owner's responsibility to accept enhanced voucher assistance on behalf of eligible tenants if an owner opts out of the Section 8 project-based contract.  For example, Chapter 11, Section 3, of the handbook, entitled "Tenant Protections," provides that

> tenants who receive an enhanced voucher have the right to remain in their units as long as the units are offered for rental housing when issued an enhanced voucher sufficient to pay the rent charged for the unit, provided that the rent is reasonable. Owners may not terminate the tenancy of a tenant who exercises this right except for cause under Federal, State, or local law.

Appendices 11-1 and 11-2 of the Section 8 Renewal Policy Guidebook prescribe the required form of opt-out notice that an owner is required to send to tenants, which includes a statement that federal law allows the tenant to elect to continue living at the current property and which includes a certification that the owner will honor the tenant's right as a tenant to remain at the property.  Section 8-1 of the HUD Guidebook requires owners to certify that they will honor

the tenant's right to remain after the owner opts-out. <u>See also</u> Section 1-5 ¶ I, which states that owners must certify that they will comply with the requirement to allow families with enhanced vouchers who elect to remain to do so as long as the property remains a rental property.

Similarly, HUD Notice PIH 2001-41, which was issued on November 14, 2001 and references Section 8 Tenant-Based Assistance (Enhanced and Regular Housing Choice

> Vouchers) For Housing Conversion Actions states in part II(B), entitled "Enhanced voucher family right to remain," that "[a] family that receives an enhanced voucher has the right to remain in the project as long as the units are used for rental housing."

Other than the differences noted above, Section 8 enhanced vouchers are subject to the same terms and conditions as ordinary Section 8 vouchers under 42 U.S.C. § 1437f(o). <u>See</u> 42 U.S.C. § 1437f(t)(1).  Specifically, 42 U.S.C. §1437f(o)(7)(B)(ii)(I) requires that all leases offered by landlords to Section 8 tenants "are consistent with State and local law"; and 42 U.S.C. §1437f(o)(7)(C) provides that all such leases "shall provide that during the term of the lease, the owner shall not terminate the tenancy except for serious or repeated violation of the terms and conditions of the lease, for violation of applicable Federal, State, or local law, or for other good cause."

The landlord of a tenant receiving a Section 8 voucher is required to sign a Housing Assistance Payment (HAP) contract with the public housing authority. 42 U.S.C. § 1437f(o)(7). HUD provides a standard HAP contract form that sets out, inter alia, the terms and conditions of the Section 8 program participation and the relationship between the landlord and public housing authority.  This form is used by the New York City Housing Authority (NYCHA) for all Section 8 HAP contracts that it enters into with landlords.  The period of the HAP contract is coterminous with the lease period.  Part A of the HAP contract states both the total rent to be paid to the landlord (the "rent to owner" or "contract rent") and the rent payments to be made

monthly by the housing authority to the landlord (the "housing assistance payment.")  The HAP contract provides that the owner may not raise the rent during the lease term.

Part B, section 8.d of the HAP contract, titled "Owner Certification," provides that "[e]xcept for the rent to owner, the owner has not received and will not receive any payments or other consideration (from the family, the PHA, HUD, or any other public or private source) for rental of the contract unit during the HAP contract term."

Part C, section 5.e of the HAP contract provides that "[t]he owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner."

Part C, section 6.c. provides that "[t]he owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises."

Part C, section 2.b. provides that [t]he tenant shall have the right to enforce the tenancy addendum against the owner."

## II.    STATE AND LOCAL LAW

In addition to the requirements of the Section 8 program, New York State and City law place certain restrictions on residential lease terms.

New York State law requires landlords of residential properties to provide all maintenance and repair necessary to make any dwelling unit safe and fit for habitation.  The statutory warranty of habitability set forth in New York Real Property Law § 235-b provides that

> In every written or oral lease or rental agreement for residential premises the landlord or lessor shall be deemed to covenant and warrant that the premises so leased or rented and all areas used in connection therewith in common with other tenants or residents are fit for human habitation and for the uses reasonably intended by the parties and that the occupants of such premises shall not be subjected to any conditions which would be dangerous, hazardous or detrimental

7

to their life, health or safety.

The Administrative Code of the City of New York prohibits landlords from refusing to rent to or otherwise discriminating against tenants on the basis of the tenant's lawful source of income. See New York City Administrative Code § 8-107(f).  "Lawful source of income" is defined as specifically including "income derived from social security, or any form of federal, state or local public assistance or housing assistance including section 8 vouchers." New York City Administrative Code § 8-102.

New York Real Property Law § 234 prohibits residential lease clauses requiring tenants to bear the cost of the landlord's legal fees for actions arising out of the lease regardless of the outcome of the action.

## STATEMENT OF FACTS

### I.        BACKGROUND

12.     Plaintiff Alicia Moore is a low income tenant residing in apartment 4E at 2211 Ditmas Avenue, Brooklyn, New York, a residential complex owned by defendant Ditmas Park Two LLC and managed by Carnegie Management Inc.

13.     Ms. Moore is a long-term tenant who has lived at 2211 Ditmas Avenue since the building was subject to project-based Section 8 contracts.  She currently receives a Section 8 enhanced voucher, upon which she relies to pay a substantial portion of her rent, which she otherwise could not afford on her fixed income.

14.     Upon information and belief, in the early 1980s 2211 Ditmas Avenue was rehabilitated with federal and private funds through a program administered by the Department of Housing Preservation and Development of the City of New York (hereinafter "HPD").  In order to prevent the displacement of low income tenants as a result of rent increases authorized

by the program, HPD provided the building with project-based rental subsidies for apartments occupied by low income and therefore eligible tenants. On information and belief, subsidies were provided by HUD but were administered by HPD.

15.     It is undetermined whether the rehabilitation performed to the building in the early 1980s was sufficient to remove the building from coverage by the New York Rent Stabilization Law, and thus whether plaintiff's apartment is rent stabilized.  Primary jurisdiction for such determinations is given to the New York Division of Housing and Community Renewal. Plaintiff does not seek a determination of rent stabilized status or any related relief in this action.

16.     Upon information and belief, at the completion of the rehabilitation of the building, defendant Ditmas's predecessor-in-interest entered into a project-based subsidy contract with HPD.  Under this contract, known as a Housing Assistance Payments ("HAP") contract, Ms. Moore's rent was subsidized by the Section 8 Program.

17.     On information and belief, in 2005 the project-based subsidy contract for 2211 Ditmas Avenue expired and was not renewed by Ditmas's predecessor-in-interest.  At that time, the New York City Housing Authority (NYCHA) conducted a Rent Comparability Study and permitted Ditmas's predecessor-in-interest to set new rent levels, resulting in a significant rent increase for Ms. Moore's apartment in 2005.  NYCHA offset this rent increase by issuing Ms. Moore an enhanced Section 8 voucher and entering into an individual HAP contract with defendants.

18.     On or about August 28, 2007, defendant Ditmas purchased 2211 Ditmas Avenue. Simultaneously, a related entity called Ditmas Park LLC, also owned by principal Isaac Jacobs, purchased the building around the corner at 585 East 21st Street.  That building had also historically been subject to a project-based Section 8 subsidy contract, which expired in 2002.

As with 2211 Ditmas Avenue, the low-income tenants of 585 East 21st Street were issued enhanced Section 8 vouchers.  Mr. Jacobs' companies have owned and managed 2211 Ditmas Avenue and 585 East 21st Street since 2007.

19.     In 2009, Ditmas Park Two LLC, under the direction of defendant Isaac Jacobs, improperly refused to renew the leases of two other enhanced voucher-holding tenants of 2211 Ditmas, Florence Morgan and Lenore Moore (who happens to be Alicia Moore's sister).  Ditmas then began no-grounds eviction proceedings against those tenants in violation of 42 U.S.C. § 1437f(t)(1)(b).  On or about March 30, 2009, Florence Morgan and Lenore Moore commenced a Declaratory Judgment action against Ditmas and Isaac Jacobs, <u>Florence Morgan & Lenore Moore v. Ditmas Park Two LLC & Isaac Jacobs</u>, 2009 Civ. 1318 (E.D.N.Y.).  That action was settled by stipulation on May 14, 2010.  The stipulation provided that

> Defendants agree and acknowledge that Plaintiffs may not be evicted except for cause, and accordingly may not be subject to eviction as the result of the commencement of a "no-grounds" holdover.

20.     Thus, Isaac Jacobs and, through him, Ditmas and Carnegie, were on notice by at least May 14, 2010 that it was illegal to terminate the tenancy of an enhanced voucher-holder without cause.

## II.    FIRST EVICTION PROCEEDING AGAINST PLAINTIFF

21.     Nevertheless, Ditmas and Mr. Jacobs' other companies shortly renewed their efforts to improperly evict tenants holding enhanced vouchers.

22.     On or about December 19, 2011, Ditmas served a Thirty Day Notice on Alicia Moore, falsely alleging that she was a month-to-month tenant, purporting to terminate her tenancy effective January 31, 2012, and threatening to commence an eviction proceeding in New York City Civil Court if she did not vacate by that date.  The Thirty Day Notice was signed by

10

defendant Isaac Jacobs.

23.     Ditmas then commenced a summary holdover proceeding against Ms. Moore in New York City Civil Court by petition dated February 27, 2012.  The holdover petition did not allege any wrongdoing or breach of tenancy obligations by Ms. Moore.  Rather, it was premised entirely on the allegation that Ms. Moore was a month-to-month tenant and could be evicted without cause.

24.     On March 12, 2012, plaintiff's counsel served a verified answer on Tenenbaum, Berger & Shivers, LLP, counsel for Ditmas in that proceeding.  The answer alleged as its first defense that Ms. Moore was in possession of an enhanced Section 8 voucher and that therefore the holdover petition failed to state a cause of action.

25.     On March 26, 2012, plaintiff's counsel appeared in the holdover proceeding at the New York City Civil Court, Kings County.  Tenenbaum, Berger & Shivers, LLP appeared as counsel for Ditmas.  A representative from NYCHA appeared pursuant to a judicial subpoena.  The representative from NYCHA represented to plaintiff's counsel and counsel for Ditmas that Ms. Moore was in possession of an enhanced Section 8 voucher.  Nevertheless, Ditmas, through its attorneys, refused to discontinue the holdover proceeding and reinstate Ms. Moore's tenancy.

26.     Only after extensive advocacy and a threatened sanctions motion by plaintiff's counsel did Ditmas agree to withdraw its holdover proceeding by stipulation dated June 27, 2012.

## III.    ATTEMPTED TERMINATIONS OF OTHER TENANTS

27.     Ditmas's conduct was not limited to Ms. Moore.  On or about December 28, 2011, Isaac Jacobs' other corporation, Ditmas Park LLC, served a Thirty Day Notice on Gloria Lawrence, holder of an enhanced Section 8 voucher and a low-income, long-term tenant of 585

East 21st Street (the companion building to 2211 Ditmas Avenue, also managed by Carnegie). As with Ms. Moore, the Notice served on Ms. Lawrence falsely alleged that she was a month-to-month tenant, purported to terminate her tenancy effective January 31, 2012, and threatened that if she did not vacate her apartment by that date, Ditmas Park LLC would commence an eviction proceeding against her in New York City Civil Court.  The Thirty Day Notice was signed by defendant Isaac Jacobs.

28.     Only after plaintiff's counsel threatened Ditmas Park LLC's attorneys with a sanctions motion did the landlord agree not to commence an eviction proceeding.

29.     At the same time, Mr. Jacobs attempted to improperly evict a number of other voucher-holding tenants of his two buildings.  Ditmas Park LLC served a Thirty Day Notice on Byron Anderson, another voucher-holding tenant of 585 East 21st Street.  Again, the Notice falsely alleged that Mr. Anderson was a month-to-month tenant and that he must vacate his apartment within 30 days or face an eviction proceeding.  Ditmas Park LLC did commence an eviction proceeding against Mr. Anderson on or about December 1, 2011.  Again, the proceeding against Mr. Anderson was discontinued only after extensive advocacy and threat of sanctions by counsel.

30.     Earlier this year, defendants served a Thirty-Day Notice on Florence Morgan, one of the plaintiffs in the 2009 federal action in which defendants conceded that they could not evict tenant holding enhanced vouchers without cause.  Nevertheless, defendants went on to commence a no-cause summary eviction proceeding against Ms. Morgan on the ground that she was allegedly a month-to-month tenant with no right to remain in her apartment.  Again, that proceeding was discontinued by defendants only after appearance and advocacy by plaintiff's counsel.

Defendants have also used other tactics to pressure voucher-holders to give up their apartments. Lenore Moore, Ms. Morgan's co-plaintiff in the 2009 declaratory judgment action, surrendered her apartment after defendants repeatedly refused to provide repairs, even while they renovated neighboring vacant apartments.  Section 8 tenants Carolyn Wallace and Frank Young moved out after similar pressure.  In all, about ten Section 8 voucher-holders have moved out of 2211 Ditmas Avenue over the past few years.

## IV.    IMPROPER LEASE AND RENEWED EVICTION THREAT AGAINST PLAINTIFF

31.     On or about May 23, 2012, after defendants failed to evict Ms. Moore, Carnegie Management, as agent for Ditmas Park LLC, mailed Ms. Moore an eight-page renewal lease. The lease contained multiple terms that were in violation of federal, state, and local law.  Among other provisions, the lease would waive Ms. Moore's protection from no-cause evictions under 42 U.S.C. § 1437f(t)(1)(b).  Other provisions would allow defendants to charge rent above and beyond what was reported to NYCHA Section 8 and to evict Ms. Moore if she failed to pay this additional rent.  Another lease provision would make Ms. Moore subject to a 5% ($74.50) "late fee" because a portion of her rent is paid by the Department of Social Services, whose policy is to issue payments in the middle of the month.  This provision would violate the New York City statute barring discrimination on the basis of lawful income.  A number of other provisions would waive Ms. Moore's right under New York State law to repairs and maintenance provided by her landlord.

### A.    EVICTION WITHOUT GOOD CAUSE

32.     Paragraph 61 of the proposed lease would violate 42 U.S.C. § 1437f(t)(1)(b)'s prohibition of no-cause evictions by allowing the landlord to unilaterally terminate Ms. Moore's tenancy without cause at any time upon 30 days' notice.  Specifically, the paragraph would

13

provide that

> the Landlord may at any given time buy out the Tenant from this lease by giving him [sic] 30 day written notice the Landlord will pay to Tenant an amount equal to one month rent . . . In the event Tenant fails to surrender possession at the end of 30 days, tenant waives the buy out amount, however the expiration  date of the lease shall be accelerated and this lease shall expire on the 30th day of the 30 day buy out notice as if that day were the date herein definitely fixed for the expiration of the term.

33.     Thus, their attempt to evict plaintiff without cause having been foiled by the protections contained in the Section 8 statute, defendants now demand that she voluntarily waive those protections.

**B.     RENT CHARGED ABOVE WHAT IS ALLOWED UNDER THE SECTION 8 PROGRAM**

34.     A number of lease provisions would constitute an end-run around  Section 8 statute and rules by allowing defendants to charge Ms. Moore rent above 30% of her income.

35.     Paragraph 35 of the lease would set Ms. Moore's rent at $4000.00 and treat the actual rent of $1490.00 – stated on the face of the lease and in the HAP contract – as a "preferential" rent that can be revoked by the landlord at any time.  Thus, this provision would allow defendants to unilaterally increase Ms. Moore's rent to $4000.00 mid-lease, in violation of the HAP contract and 42 U.S.C. §1437f(o)(2)(A)

36.     The lease further imposes extensive fees to be collectible by defendants as "added rent." See Paragraphs 4, 8, 9, 35, 53, 59, 66.D.  These fees include: fees charged for any needed repair to the apartment, whether caused by the tenant or not, in violation of the statutory warranty of habitability contained in New York Real Property Law 235-b; a 5% late fee if rent is paid after the first of the month; and legal fees for any action taken by the landlord, regardless of the outcome.  Because these fees are treated as "added rent" under the lease, if the tenant fails to pay a fee, "Landlord shall have the same rights against Tenant as if Tenant failed to pay

rent,"including eviction.  (In contrast, unpaid non-rent fees cannot be the basis for a possessory judgment.)

37.     In addition to increasing the rent beyond what is allowed under the Section 8 program, these fees would also violate state and city laws.  Because Ms. Moore receives public assistance, a portion of her rent is paid in two monthly installments by the Department of Social Services at the middle and end of each month.  The imposition of a late fee for DSS payments made pursuant to public assistance rules would violate NYC Admin. Code 8-107(f), which prohibits discrimination in housing on the basis of a tenant's source of income or means of payment of rent.  Indeed, a 5% fee triggered by the DSS payment schedule would effectively raise Ms. Moore's rent by $74.50 per month over the rent stated in the lease and HAP contract. This additional rent would not be covered by Section 8.

38.     The imposition of legal fees on Ms. Moore regardless of the merit or outcome of the landlord's actions would violate New York Real Property Law 234.

### C.     WAIVER OF TENANT RIGHTS UNDER CITY AND STATE LAW

39.     A number of lease provisions would remove the landlord's responsibility to maintain or perform any repairs whatsoever in the apartment, and would impose such duties on Ms. Moore in violation of New York Real Property Law 235-b. See Paragraphs 9, 36, 47, 54.A, 54.C.  Paragraph 18 would further waive the statutory warranty of habitability by prohibiting Ms. Moore from raising counterclaims in any action brought against her by the landlord for rental arrears.

40.     Paragraph 10 of the lease expressly waives New York Real Property Law 227, which protects a tenant from liability for ongoing rent when an apartment is destroyed by fire or disaster.

41.     Paragraphs 9 and 54(A) of the lease waives the landlord's obligation to perform repairs and maintenance necessary to make the apartment habitable and requires plaintiff, as the tenant, to perform all repairs at her "sole cost and expense" in violation of New York Multiple Dwelling Law § 78(1), which provides that "[e]very multiple dwelling, including its roof or roofs, and every part thereof and the lot upon which it is situated, shall be kept in good repair. The owner shall be responsible for compliance with the provisions of this section."

42.     Paragraph 21(13) would require plaintiff to obtain the landlord's consent before having "whichever type of gathering" in her apartment.  This would violate plaintiff's common law tenancy right to entertain visitors, as well as New York Real Property Law § 230, which provides that "[t]enants' groups, committees or other tenants' organizations shall have the right to meet without being required to pay a fee in any location on the premises . . ." and "[n]o landlord shall interfere with the right of a tenant to form, join or participate in the lawful activities of any group, committee or other organization."

**D.     STRICTER TENANCY CONDITIONS**

43.     Other lease provisions would impose stricter tenancy requirements on Ms. Moore than have ever been a part of her tenancy:

44.     Paragraph 7 would prohibit Ms. Moore from using even such basic appliances as "a freezer, heater, ventilator [or] air cooling equipment" without the landlord's written consent.

45.     Paragraph 21(5) would require Ms. Moore to install wall-to-wall carpeting in every room of her apartment, at her own cost; the carpeting would then become the property of the landlord.

46.     Paragraphs 21(6) and 57 would prohibit Ms. Moore from keeping a pet.  Ms. Moore has kept a pet cat since she took possession of the apartment, and is entitled to continue to do so

16

under New York City Administrative Code § 27-2009.1.

## IV.   RESPONSE TO LEASE

47.    Upon receiving the lease, Ms. Moore attached a signed rider stating that she did not "waive any rights conferred to her by City, State or Federal Law, or by the rules and regulations governing the Section 8 Housing Choice Program and the HAP Contract . . ."; that she did not "consent to treat any fees other than the monthly rent as 'added rent,' by virtue of the prohibitions set forth in 42 U.S.C. § 1437a(a)"; that public assistance rent paid monthly by the Department of Social Services would not be considered late if paid after the first of the month; and that "Tenant has a cat and has had one since she took possession of apartment.  Tenant does not agree to any prohibition on cats."  Ms. Moore returned the lease and rider to Carnegie Management at the address provided on the lease.

48.    On or about September 28, 2012, Charles Schwartz of Carnegie sent Ms. Moore a letter rejecting the rider and stating that if she did not accept the lease without rider "by October 31, 2012 then we will have no choice but to presume you are refusing to agree to a new lease for the Subject Premises.

> Be advised, we will enforce any and all rights we may have under the law if you refuse to accept the Counterproposal without the Rider as your full new lease agreement.  This includes but is not limited to commencing an eviction proceeding against you pursuant to 24 CFR 982-310(a).

The letter was cc'ed to the attention of defendant Isaac Jacobs.

49.    Thus, defendants have stated their intention to commence an eviction proceeding against Ms. Moore if she does not agree to waive her rights under city, state, and federal law. Specifically, defendants have demanded that they be allowed to evict Ms. Moore without cause at any time, that Ms. Moore allow defendants to charge her rent above that allowed under the Section 8 enhanced voucher program, that she release the landlord from its duty to maintain the

apartment and perform repairs, that Ms. Moore give up her pet cat that she is permitted to keep under the New York Pet Law, and that she pay late fees (charged as additional rent) each month in exchange for petitioner accepting public assistance payments from the Department of Social Services.

50.     Such lease provisions would likely result in NYCHA rejecting the lease and refusing to enter into a new HAP contract with defendants or make Section 8 payments.  Thus, defendants' insistence on these "poison pill" lease terms is in effect an indirect means of refusing to accept Ms. Moore's Section 8 voucher as required by 42 U.S.C. § 1437f(t).

51.     Defendants' coercive and improper actions are an extension of their long-standing attempts to rid their buildings of all Section 8 enhanced voucher-holders.  Having repeatedly failed to evict tenants – including plaintiff - directly, defendants now seek to achieve the same end by pressuring plaintiff to waive the legal rights that protect her against no-cause eviction, or by using her refusal to waive those rights as a basis for eviction in itself.

## FIRST CAUSE OF ACTION

52.     Defendants are in violation of 42 U.S.C. § 1437f(t) and implementing rules and regulations by threatening to evict plaintiff without good cause.

## SECOND CAUSE OF ACTION

53.     Defendants are in violation of 42 U.S.C. § 1437f(t) and implementing rules and regulations by demanding that plaintiff sign a lease including waivers of her rights under federal, state and local law.

## THIRD CAUSE OF ACTION

54.     Defendants are in violation of 42 U.S.C. § 1437f(t) and implementing rules and regulations by failing to offer plaintiff a lease in compliance with the requirements of the Section

8 program.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court:

(1)      enter a final judgment pursuant to 28 U.S.C. §§ 1331, 1343(3) and 1337 of the

Federal Rules of Civil Procedure declaring that defendants' conduct against plaintiff violates 42

U.S.C. § 1437f(t) and the HUD Section 8 Renewal Policy Guide (January 15, 2008);

(2)      enter a mandatory injunction compelling defendants to renew plaintiff's lease on

terms in compliance with Section 8 statute and rules, and state and local law;

(3)      enter a mandatory injunction prohibiting defendants from evicting or attempting

to evict plaintiff without good cause;

(4)      enter a mandatory injunction prohibiting defendants from attempting to induce

plaintiff to waive any right under federal, state, or local law or from retaliating against her for

exercising or refusing to waive such rights; and

(5)      grant such other and further relief as the Court may deem just and proper.


Dated: Brooklyn, NY
      December 7, 2012

                        Yours,

                        South Brooklyn Legal Services, Inc.
                        105 Court Street
                        Brooklyn, New York 11201
                        (718) 237-5500
                        Attorneys for the Plaintiffs


                By: _____
                        MICHAEL GRINTHAL (MG2547)
                        Staff Attorney